[No. B216521. Second Dist., Div. Three. Dec. 15, 2009.]

In re VIOXX CLASS CASES.

118

COUNSEL

Hagens Berman Sobol Shapiro, Steve W. Berman, Craig R. Spiegel and Elaine T. Byszewski for Plaintiffs and Appellants Leoda Anderson, Beatrice Howard and Adam Selkowitz.

O'Melveny & Myers, Richard B. Goetz and Charles C. Lifland for Defendant and Respondent Merck & Co., Inc.

OPINION

CROSKEY, J.—Defendant Merck & Co., Inc. (Merck), manufactured and marketed Vioxx, a pain-relieving drug. Vioxx was pulled from the market on September 30, 2004, after a study indicated that the drug created a risk of adverse cardiovascular effects. The plaintiffs in this action brought suit against Merck. Plaintiffs do not assert that they suffered any adverse effects from taking Vioxx. Instead, they assert that, due to its cardiovascular risks, Vioxx was *less safe* than other, less expensive, pain relievers. Plaintiffs seek recovery, on behalf of all persons and entities in California who paid for Vioxx, of the difference in price between what they paid for Vioxx and what they would have paid for a safer, equally effective, pain reliever. Alleging that Merck knew about the dangers of Vioxx but engaged in a campaign to hide or explain away those risks, plaintiffs pursued causes of action for unfair competition (Bus. & Prof. Code, § 17200; UCL), false advertising (Bus. & Prof. Code, § 17500; FAL), violation of the Consumers Legal Remedies Act (Civ. Code, § 1750 et seq.; CLRA), and unjust enrichment.[1]

Plaintiffs moved for certification of a class action. After considering thousands of pages of documents, the trial court denied the motion, concluding that common issues of fact did not prevail over individual issues. The court also concluded that the named plaintiffs, who were all individuals, did not possess claims typical of prescription drug benefit providers who had paid all or part of the purchase price of Vioxx for their subscribers. (These providers are referred to by the parties as "Third-Party Payors" or "TPPs.")

Plaintiffs appeal, arguing, in part, that the Supreme Court's intervening decision in *In re Tobacco II Cases* (2009) 46 Cal.4th 298 [93 Cal.Rptr.3d 559, 207 P.3d 20] (*Tobacco II*) undermines the trial court's rationale. We conclude

---

[1] Merck obtained judgment on the pleadings on plaintiffs' causes of action for breach of express and implied warranty. A cause of action for deceit by concealment also appears to have been eliminated by the time of the motion for class certification at issue in this appeal; the record does not reveal its disposition.

that the trial court's ultimate decision is consistent with *Tobacco II*, and is supported by substantial evidence. We therefore affirm.[2]

## FACTUAL AND PROCEDURAL BACKGROUND

### 1. *Vioxx—Its Risks and Advertising*

Vioxx is an NSAID—a nonsteroidal anti-inflammatory drug. Aspirin is an NSAID, as is naproxen, which is sold over the counter under the trade name Aleve. NSAID's work by inhibiting the pain-transmitting enzyme cyclooxygenase. There are two such enzymes, known as COX-1 and COX-2. Earlier COX-inhibitor NSAID's, such as aspirin and naproxen, inhibit both COX enzymes. Inhibiting COX-1, however, leads to a risk of adverse gastrointestinal effects. Therefore, drug manufacturers sought a *selective* COX inhibitor, which would inhibit only COX-2, and, in theory, result in pain relief without the usual risk of adverse gastrointestinal effects. The first such COX-2 inhibitor was celecoxib, marketed by Pfizer under the trade name Celebrex. The second COX-2 inhibitor was rofecoxib, which was marketed by Merck under the name Vioxx.

It was subsequently determined that, although Vioxx inhibited pain without the risk of the adverse gastrointestinal effects of other NSAID's, Vioxx caused a greater risk of adverse cardiovascular effects. It is beyond the scope of this opinion to consider or discuss the scientific basis for this, although it is speculated that the COX-2 enzyme has an anticlotting effect, and selective inhibition of this enzyme may therefore cause the formation of dangerous blood clots.

Around the time of Vioxx's initial release, Merck sponsored a study on Vioxx, called the VIGOR (Vioxx Gastrointestinal Outcomes Research) study. The goal of the study was to establish Merck's hypotheses that Vioxx was (1) equally effective at pain relief as naproxen; and (2) substantially safer from a gastrointestinal point of view. The VIGOR study did establish both of these points. However, the group of VIGOR participants who were taking Vioxx experienced a (statistically significant) greater amount of adverse cardiovascular events than the group of VIGOR participants who were taking naproxen. Barring coincidence, only two possible explanations existed for this result: either Vioxx caused adverse cardiovascular events or naproxen protected against them.[3] There was no existing scientific evidence that

---

[2] The facts we recite are either undisputed and reflected in the record or were found by the court in its order deciding the class certification before us.

[3] A third possibility was also offered by Merck. Merck chose to exclude from the study anyone who was taking prophylactic low-dose aspirin to protect against heart attacks; Merck did this because anyone taking low-dose aspirin would then have the usual NSAID risk of

naproxen had any cardioprotective effect. Nonetheless, when the results from the VIGOR study were published in the New England Journal of Medicine in November 2000, the article suggested that the results were due to naproxen's being cardioprotective, a theory referred to by the parties as "the naproxen hypothesis." Ultimately, the naproxen hypothesis would be proven false.

The VIGOR study—its design, its results, and the way those results were presented—represents a key point in plaintiffs' understanding of the history of the case. According to plaintiffs, Merck advertised Vioxx to the public (through press releases, commercials and magazine advertisements) as *safe*, without mentioning its cardiovascular risks. Similarly, plaintiffs allege that Merck represented to prescribing physicians (through marketing representatives, product labels, direct-mailed letters, and published studies) that Vioxx did not cause a risk of adverse cardiovascular effects. Plaintiffs allege that after the VIGOR study, Merck knew or should have known that Vioxx was unsafe from a cardiovascular point of view but, rather than acknowledge this, Merck downplayed any cardiovascular risk and instead clung to the baseless naproxen hypothesis. Merck withdrew Vioxx from the market on September 30, 2004, after another study indicated that Vioxx was indeed responsible for an increased risk of adverse cardiovascular events. Plaintiffs allege that Merck knew about this risk for years, but intentionally deceived the public, and physicians, about it in order to increase sales.

### 2. Gravamen of Plaintiffs' Complaint

While plaintiffs pursue four causes of action (UCL, FAL, CLRA, and unjust enrichment), each cause of action is based on the same general theory of relief.[4] Plaintiffs assert that, as Vioxx was *no more effective* than generic naproxen at relieving pain, and *less safe* than generic naproxen, Vioxx was actually *worth no more* than generic naproxen. Vioxx, however, was a nongeneric drug and generally cost more than generic naproxen. As Merck misled consumers into paying more for Vioxx by misrepresenting it as safer than generic naproxen, plaintiffs sought the difference between the price paid for Vioxx and the price which would have been paid for generic naproxen. In their declarations, the named plaintiffs did not assert that they would have purchased generic naproxen instead of Vioxx; they simply stated that had

---

adverse gastrointestinal effects, defeating the purpose of the study. Merck suggested that if it excluded from the VIGOR results those individuals who *should have been* on low-dose aspirin, the difference in adverse cardiovascular events between the Vioxx and naproxen groups was no longer significant.

[4] We note that plaintiffs are pursuing only the economic losses purportedly caused by Vioxx not being as safe a drug as represented; they do not purport to seek damages for any physical injuries incurred as the result of taking Vioxx. However, their definition of the proposed class does not exclude from membership anyone who was injured as a result of taking Vioxx.

they been informed that equally effective and safer alternatives were available, they would not have purchased Vioxx. Merck attempted, through discovery, to determine which alternative drug the named plaintiffs would have used had they known about the risks of Vioxx. Plaintiffs responded that the drug they would have used was irrelevant. What matters, according to plaintiffs, is that they paid for Vioxx believing that it was better than a generic NSAID, when, in fact, Vioxx was no better than (and was perhaps worse than) a generic NSAID. Thus, a generic NSAID is a proper conservative estimate of the true value of the Vioxx received.

### 3. *Plaintiffs' Motion for Class Certification*

On July 27, 2007, plaintiffs filed a motion for class certification, seeking to certify the class of "[a]ll individuals or entities in California who, from June 1, 1999 to October 1, 2004, inclusive, paid some or all of the purchase price for the prescription drug Vioxx manufactured by Merck & Co., Inc."[5] Plaintiffs supported their motion with substantial documentation intended to show that Merck's representations to the public and prescribing physicians were all part of a common, unified campaign to downplay or outright ignore the cardiovascular risks of Vioxx which were known to Merck. While the precise details of the representations and omissions need not be discussed here, we note that, in general, Merck's direct-to-consumer advertisements did not address the cardiovascular risks at all. In contrast, adverse cardiovascular *data* from the VIGOR study was disclosed to physicians via the publication of the study[6] and Vioxx's labeling, but Merck attempted to downplay the significance of that data by (1) advancing the naproxen hypothesis; (2) pointing to favorable data culled from other studies; and (3) making reassurances that Vioxx was safe. Indeed, plaintiffs allege in their complaint that an April 2002 label revision on Vioxx would have revealed the cardiovascular risk to "someone with enough medical knowledge to make sense of Merck's warning," but that this was undermined by a near simultaneous press release stating that the significance of the cardiovascular findings from the VIGOR study was " 'unknown' " and that Merck was " 'confident in the efficacy and safety profile of Vioxx.' "

Plaintiffs also relied on the declaration of a medical expert, John David Abramson, M.D., to the effect that (1) Merck's representations were biased

---

[5] The only individuals excluded from the class were employees of Merck and members of the trial judge's immediate family.

[6] Plaintiffs assert that not *all* of the adverse cardiovascular data were, in fact, disclosed in the New England Journal of Medicine article on the VIGOR study. They allege that three heart attacks suffered by individuals taking Vioxx during the study were improperly excluded, and that if Merck had included those heart attacks, Merck's theory that the heart attacks were suffered only by those who should have been on prophylactic aspirin would have been unsupported.

and misleading; and (2) "a responsible physician who received the full and accurate disclosure of information about the risks and benefits of Vioxx would not have prescribed it as there were on the market other alternatives that were as effective and/or safer." Plaintiffs also relied on the declaration of an expert in pharmaceutical economics to the effect that, if generic naproxen is used as the comparator, the proper mathematics exist to enable the price differential to be calculated on a classwide basis.[7]

### 4. Merck's Opposition

Merck opposed the certification motion with an equally impressive quantity of documentation designed to establish that individual, rather than common, issues prevailed. Merck relied on the many different warning labels used on Vioxx and several published Vioxx studies in order to demonstrate that Merck's representations regarding Vioxx's risks changed over time and were not, in fact, common.

Merck also submitted evidence suggesting that plaintiffs' theory of the case—that Vioxx was no better, and less safe, than generic naproxen—was a vast oversimplification, where the truth involved many patient- and physician-specific issues. For example, Merck submitted the declaration of David S. Silver, M.D., its medical expert, to the effect that, prior to the advent of COX-2 inhibitors, numerous patients suffered potentially life-threatening side effects from traditional NSAID's. Dr. Silver stated that, "it was estimated that each year 16,500 people in the United States died as a result of the most common complication of NSAIDs, gastrointestinal bleeds, and over 100,000 were hospitalized." He stated that "One out of six medication-induced deaths in the country was attributed to NSAIDs, by far the most of any drug class." As such, while generic naproxen was safer from a cardiovascular standpoint than Vioxx, naproxen was not safer from a gastrointestinal standpoint. Dr. Silver stated that, "for patients with a history of serious [gastrointestinal] problems who had already tried, and been unable to tolerate, traditional NSAIDs," a COX-2 inhibitor like Vioxx "may have been the only appropriate option."[8] Dr. Silver estimated that approximately 25 percent of his patients who tried naproxen could not tolerate it. Moreover, setting aside the gastrointestinal risks of traditional NSAID's, some patients simply did not respond to them, but did respond to Vioxx. In other words,

---

[7] The economist did not do the precise calculations for the plaintiff class. He calculated the price differential to be approximately $8.3 billion across the United States, but did not calculate the price differential restricted to California purchasers.

[8] Plaintiffs do not entirely disagree; their complaint alleges that Vioxx "is a superior treatment in only a small percentage of patients who are at great risk from gastrointestinal side effects of NSAIDs."

while, overall, one could say that Vioxx was no more effective than traditional NSAID's, for the patients for whom naproxen failed to work, Vioxx was more effective.

Data from some of the TPP's also supported this conclusion.[9] Larger TPP's have pharmaceutical and therapeutics (P&T) committees, which are responsible for determining which drugs are on their formularies—the approved lists of drugs from which doctors can prescribe for patients on their plans. The evidence indicates that some P&T committees did a substantial amount of research into the risks of Vioxx, without unquestioningly accepting Merck's naproxen hypothesis for the adverse cardiovascular effects noted in the VIGOR study. Indeed, some large TPP's gathered their own data on the possible cardiovascular risks of Vioxx. The documentation indicates that the P&T committees of some TPP's were well aware of the potential cardiovascular effects of Vioxx, which resulted in Vioxx usage being approved in only limited circumstances. Under the plans of some TPP's, Vioxx was approved *only* when the patient had a history of gastrointestinal disease or had first tried two traditional NSAID's without success. Thus, those TPP's paid for Vioxx only if it had been determined that, for each particular patient, Vioxx was safer, or more effective, than traditional NSAID's. For patients who obtained their prescription drug benefits through such TPP's, those patients could not obtain Vioxx unless Vioxx was safer, or more effective, than traditional NSAID's—unless the patient chose to pay the purchase price for Vioxx independently.

Merck also submitted further evidence that generic naproxen was not an appropriate comparator, based on what actually occurred when Vioxx was pulled from the market. Dr. Silver stated that when Vioxx was removed from the market "[f]ew, if any of [his] patients were able to be successfully transferred to naproxen, which is unsurprising given that there was reason to put them on a [COX-2 inhibitor] in the first instance."[10] Data from one of the TPP's bears this out—when Vioxx was removed from the market, the majority of its Vioxx patients switched to another COX-2 inhibitor. Finally, Merck submitted anecdotal evidence that there are individuals who would happily take Vioxx, knowing its risks, if it were back on the market today.

In sum, Dr. Silver stated that, "[t]he process by which a physician decides whether and what to prescribe for a pain patient requires an individualized approach that applies a physician's clinical judgment to each patient's unique situation. This decision requires a physician to assess a number of factors

---

[9] Nonparty discovery was limited to a handful of TPP's.

[10] It was possible to counteract the adverse gastrointestinal effects of naproxen with a proton pump inhibitor. The combination of naproxen and a proton pump inhibitor was more expensive than a COX-2 inhibitor.

which vary from patient to patient, including, among others: [¶] a. The condition being treated, including the nature, location, and extent of the pain; [¶] b. The risks and benefits associated with the drug; [¶] c. The anticipated dose and duration of the prescription; [¶] d. The patient's medical history, including any past gastrointestinal problems or drug reactions or allergies; [¶] e. The potential for adverse interactions with a patient's other medications; [¶] f. The anticipated degree of patient compliance; [¶] g. The drug's cost and the patient's insurance coverage; and [¶] h. The patient's concerns regarding treatment and his or her perception of the severity of the pain."

Dr. Silver also testified that different physicians rely on different sources of information in deciding which drug to prescribe; this is particularly true depending on the physician's specialty. Excerpts from the depositions of the physicians who prescribed Vioxx to the named plaintiffs support this conclusion. Dr. Daniel Wallace testified that he subscribes to upwards of 20 medical journals, and also gets information from professional meetings as well as pharmaceutical representatives. He adamantly stated that no pharmaceutical sales representative could convince him to prescribe a drug he otherwise does not wish to prescribe. Dr. Timothy Obermiller testified that he learns about the risks and benefits of drugs from pharmaceutical representatives, papers on clinical trials, his colleagues, continuing education, and the pharmacy department at a hospital. Dr. Joan Gabriella Heinsheimer stated that she does not trust the drug industry to perform its own scientific research. She relies on clinical use information gathered over time, journal articles, and an online "Epocrates" database which is updated regularly and free from commercial bias.

## 5. *The Trial Court's Ruling*

The trial court denied plaintiffs' motion for class certification, largely on the issue of individual, rather than common, issues prevailing. While the trial court agreed with plaintiffs that the issue of Merck's alleged misrepresentations and omissions was subject to common proof, the trial court otherwise rejected plaintiffs' overall view of the case. In other words, the court concluded that plaintiffs could not proceed on the theory that Vioxx was no more effective, and less safe, than naproxen, because such a determination cannot be made classwide, but is dependent on each individual patient's specific medical needs and history. Similarly, the trial court concluded that plaintiffs cannot establish damages by using generic naproxen as a comparator, because whether Vioxx was, in fact, no better than generic naproxen was an issue subject to individual proof for each patient. In short, while the trial court agreed that plaintiffs could attempt to establish that Merck's advertising was all part of a common scheme to misrepresent, the trial court concluded that the elements of reliance and damages were matters of individual proof,

and that these issues prevailed over the matters subject to common proof. Accordingly, the trial court denied class certification. Additionally, the trial court concluded that the named plaintiffs' claims were not typical of the claims of TPP's, although, presumably, if this were the only problem with plaintiffs' class action, the class could be redefined to exclude the TPP's.

Plaintiffs filed a timely notice of appeal. After the notice of appeal was filed, our Supreme Court decided *Tobacco II*. Plaintiffs argue, on appeal, that the trial court's ruling was erroneous under the standards reaffirmed by the Supreme Court in *Tobacco II*.[11]

## CONTENTIONS ON APPEAL

On appeal, plaintiffs challenge all aspects of the trial court's ruling. First, they argue that the trial court erred in finding the individual plaintiffs' claims were not typical of the claims of the TPP's. Second, they argue that the trial court erred in concluding that individual issues prevailed on the element of reliance, because they could establish reliance on a classwide basis and, in any event, reliance was unnecessary to their UCL and FAL causes of action. Finally, plaintiffs argue that their method of calculating damages was subject to common proof. Finding no error, however, we affirm the trial court's order denying class certification.

## DISCUSSION

### 1. *Standard of Review*

" 'Because trial courts are ideally situated to evaluate the efficiencies and practicalities of permitting group action, they are afforded great discretion in granting or denying certification. . . . [I]n the absence of other error, a trial court ruling supported by substantial evidence generally will not be disturbed "unless (1) improper criteria were used [citation]; or (2) erroneous legal assumptions were made [citation]." ' " (*Tobacco II, supra*, 46 Cal.4th 298, 311.) We consider the court's rationale, not only its result. "Accordingly, we will analyze the reasons given by the superior court in denying class certification. Any valid pertinent reason stated will be sufficient to uphold the

---

[11] The main issue resolved by the Supreme Court in *In re Tobacco II* was whether Proposition 64 (approved Nov. 2, 2004), which changed the UCL to provide that no private plaintiff could bring a representative UCL action unless that plaintiff could meet the requirements of a class action and had suffered an injury in fact, *also* required all members of the plaintiff class to have suffered an injury in fact. The court concluded that it did not. (*Tobacco II, supra*, 46 Cal.4th at p. 306.) As the trial court in the instant case stated that Proposition 64 "affected the standing of representative plaintiffs but did not change the underlying elements of the causes of action," the trial court correctly anticipated the result in *Tobacco II*.

order." (*Caro v. Procter & Gamble Co.* (1993) 18 Cal.App.4th 644, 655–656.) "Where a certification order turns on inferences to be drawn from the facts, ' "the reviewing court has no authority to substitute its decision for that of the trial court." ' " (*Massachusetts Mutual Life Ins. Co. v. Superior Court* (2002) 97 Cal.App.4th 1282, 1287 [119 Cal.Rptr.2d 190].)

### 2. Class Action Requirements

■ " 'In order to maintain a class action, certain prerequisites must be met, specifically, "the existence of an ascertainable class and a well-defined community of interest among the class members. [Citation.] The community of interest requirement embodies three factors: (1) predominant common questions of law or fact; (2) class representatives with claims or defenses typical of the class; and (3) class representatives who can adequately represent the class." ' "[12] (*Akkerman v. Mecta Corp., Inc.* (2007) 152 Cal.App.4th 1094, 1100 [62 Cal.Rptr.3d 39].)

"The predominance factor requires a showing 'that questions of law or fact common to the class predominate over the questions affecting the individual members.' " (*In re Cipro Cases I & II* (2004) 121 Cal.App.4th 402, 410 [17 Cal.Rptr.3d 1].) To determine whether the questions of fact and law at issue in the litigation are common or individual, it is necessary to consider the individual causes of action pleaded, and the issues raised thereby.

### 3. The CLRA

■ The CLRA declares numerous practices in the sale of goods or services to consumers to be unlawful. (Civ. Code, § 1770, subd. (a).) Among the practices deemed unlawful under the CLRA are: "[r]epresenting that goods . . . have . . . characteristics, . . . uses, [or] benefits . . . which they do not have" (Civ. Code, § 1770, subd. (a)(5); "[r]epresenting that goods . . . are of a particular standard, quality, or grade . . . if they are of another" (Civ. Code, § 1770, subd. (a)(7)); and "[a]dvertising goods . . . with intent not to sell them as advertised" (Civ. Code, § 1770, subd. (a)(9)). The CLRA then provides that "[a]ny consumer who suffers any damage as a result of the use or employment by any person of a method, act, or practice declared to be unlawful by [Civil Code s]ection 1770 may bring an action against that

---

[12] The CLRA has its own class action requirements, set forth in Civil Code section 1781. Both CLRA and non-CLRA class actions require ascertainability, commonality, typicality, and adequacy of representation. The distinction between a CLRA and non-CLRA class action is that a non-CLRA class action plaintiff must also establish that pursuit of the class action will result in substantial benefit to the litigants and the court, while a CLRA class action plaintiff need not do so. (*Corbett v. Superior Court* (2002) 101 Cal.App.4th 649, 670, fn. 9 [125 Cal.Rptr.2d 46].)

person to recover or obtain" actual damages, an injunction, restitution, and punitive damages.[13] (Civ. Code, § 1780, subd. (a).)

█ The language of the CLRA allows recovery when a consumer "suffers any damage as a result of" the unlawful practice. (Civ. Code, § 1780, subd. (a).) This provision "requires that plaintiffs in a CLRA action show not only that a defendant's conduct was deceptive but that the deception caused them harm." (*Massachusetts Mutual Life Ins. Co. v. Superior Court, supra*, 97 Cal.App.4th at p. 1292.) Causation, on a classwide basis, may be established by *materiality*. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class. (*Ibid.*) This is so because a representation is considered material if it induced the consumer to alter his position to his detriment. (*Caro v. Procter & Gamble Co., supra*, 18 Cal.App.4th at p. 668.) That the defendant can establish a lack of causation as to a handful of class members does not necessarily render the issue of causation an individual, rather than a common, one. " '[P]laintiffs [may] satisfy their burden of showing causation as to each by showing materiality as to all.' " (*Massachusetts Mutual Life Ins. Co. v. Superior Court, supra*, 97 Cal.App.4th at p. 1292.) In contrast, however, if the issue of materiality or reliance is a matter that would vary from consumer to consumer, the issue is not subject to common proof, and the action is properly not certified as a class action. (*Caro v. Procter & Gamble Co., supra*, 18 Cal.App.4th at p. 668.)

### 4. *The UCL and FAL*

█ The UCL defines unfair competition to "mean and include any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising and any act prohibited by [the FAL]." (Bus. & Prof. Code, § 17200.) In turn, the FAL prohibits the dissemination of any advertising "which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." (Bus. & Prof. Code, § 17500.) In their complaint, plaintiffs alleged that Merck's conduct violated all four prongs of the UCL—unlawful, unfair and fraudulent, and violative of the FAL. On appeal, plaintiffs pursue only the argument that Merck's advertising was fraudulent under the UCL and FAL.

Consumer class actions under the UCL serve an important role in the enforcement of consumers' rights. (*Kraus v. Trinity Management Services, Inc.* (2000) 23 Cal.4th 116, 126 [96 Cal.Rptr.2d 485, 999 P.2d 718].) They "make it economically feasible to sue when individual claims are too small to justify

---

[13] A senior citizen bringing a CLRA action may also be awarded a civil penalty, if certain other elements are met. (Civ. Code, §§ 1780, subd. (b)(1), 3345.) Plaintiffs sought to certify a subclass of senior citizens.

the expense of litigation, and thereby encourage attorneys to undertake private enforcement actions. Through the UCL a plaintiff may obtain restitution and/or injunctive relief against unfair or unlawful practices in order to protect the public and restore to the parties in interest money or property taken by means of unfair competition. These actions supplement the efforts of law enforcement and regulatory agencies. [The California Supreme Court] has repeatedly recognized the importance of these private enforcement efforts." (*Ibid.*)

■ Our Supreme Court has stated, "[w]hile the scope of conduct covered by the UCL is broad, its remedies are limited. [Citation.] A UCL action is equitable in nature; damages cannot be recovered. . . . We have stated that under the UCL, '[p]revailing plaintiffs are generally limited to injunctive relief and restitution.' " (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1144 [131 Cal.Rptr.2d 29, 63 P.3d 937], citation omitted.) The UCL balances relaxed liability standards with limits on liability. (29 Cal.4th at p. 1151.)

■ In order to obtain a remedy for deceptive advertising, a UCL plaintiff need only establish that members of the public were likely to be deceived by the advertising. (*Bank of the West v. Superior Court* (1992) 2 Cal.4th 1254, 1267 [10 Cal.Rptr.2d 538, 833 P.2d 545]; *Massachusetts Mutual Life Ins. Co. v. Superior Court, supra,* 97 Cal.App.4th at p. 1290.) The question has arisen as to *which* members of the public need be likely to be deceived. The law focuses on a reasonable consumer who is a member of the target population. (*Lavie v. Procter & Gamble Co.* (2003) 105 Cal.App.4th 496, 508.) "Where the advertising or practice is targeted to a particular group or type of consumers, either more sophisticated or less sophisticated than the ordinary consumer, the question whether it is misleading to the public will be viewed from the vantage point of members of the targeted group, not others to whom it is not primarily directed."[14] (*Lavie,* at p. 512.)

■ The remedies available in a UCL or FAL action are limited to injunctive relief and restitution. Injunctive relief is not available when there is no threat that the misconduct to be enjoined is likely to be repeated in the future. (*Madrid v. Perot Systems Corp.* (2005) 130 Cal.App.4th 440, 465 [30 Cal.Rptr.3d 210].) As to restitution, the UCL provides that "[t]he court may make such orders or judgments . . . as may be necessary to restore to any

---

[14] Thus, while calculating annual interest on a 360-day year is an unfair business practice when directed toward consumers (*Fletcher v. Security Pacific National Bank* (1979) 23 Cal.3d 442, 445 [153 Cal.Rptr. 28, 591 P.2d 51]), the exact same practice is not an unfair practice when directed toward a financially sophisticated business with knowledge of use of the method of calculation (*South Bay Chevrolet v. General Motors Acceptance Corp.* (1999) 72 Cal.App.4th 861, 883, 889 [85 Cal.Rptr.2d 301]).

person in interest any money or property, real or personal, which may have been acquired by means of such unfair competition."[15] (Bus. & Prof. Code, § 17203.) ■ This language, providing restitution of funds which "may have been acquired," has been interpreted to allow recovery without proof that the funds were lost as a result of actual reliance on the defendant's deceptive conduct. (*Tobacco II, supra,* 46 Cal.4th at p. 320; *Fletcher v. Security Pacific National Bank, supra,* 23 Cal.3d at pp. 450–451; *Prata v. Superior Court* (2001) 91 Cal.App.4th 1128, 1144 [111 Cal.Rptr.2d 296].) While the "may have been acquired" language of Business and Professions Code section 17203 is so broad as to allow restitution without individual proof of injury, it is not so broad as to allow recovery without any evidentiary support. (*Colgan v. Leatherman Tool Group, Inc.* (2006) 135 Cal.App.4th 663, 697 [38 Cal.Rptr.3d 36].) The difference between what the plaintiff paid and the value of what the plaintiff received is a proper measure of restitution. (*Cortez v. Purolator Air Filtration Products Co.* (2000) 23 Cal.4th 163, 174 [96 Cal.Rptr.2d 518, 999 P.2d 706].) In order to recover under this measure, there must be evidence of the actual value of what the plaintiff received. When the plaintiff seeks to value the product received by means of the market price of another, comparable product, that measure cannot be awarded without evidence that the proposed comparator is actually a product of comparable value to what was received. (*Colgan v. Leatherman Tool Group, Inc., supra,* 135 Cal.App.4th at p. 675.)

5. *Typicality—Individual Plaintiffs' Claims Are Not Typical of Those of TPP's*

The trial court concluded the named plaintiffs' claims were not typical of the claims of the TPP's,[16] on the basis that "[Merck] present[ed] persuasive evidence that the decisionmaking that goes into purchasing Vioxx on an individual basis is entirely distinct from the process for putting it into a group formulary." Plaintiffs challenge the rationale behind this finding. They argue that the decisionmaking process of the TPP's is wholly irrelevant. Instead,

---

[15] Nearly identical language appears in the FAL. (Bus. & Prof. Code, § 17535.) The two remedy provisions are to be interpreted in the same fashion. (*Bank of the West v. Superior Court, supra,* 2 Cal.4th at pp. 1272–1273.)

[16] While not raised by the parties, there appear to be two other ways in which the plaintiff class, as defined, is overbroad. First, the class fails to exclude individuals who suffered personal injury from taking Vioxx; clearly, they should not be bound in an action pursuing only economic damages for the price of Vioxx. (Cf. *Akkerman v. Mecta Corp., Inc., supra,* 152 Cal.App.4th at pp. 1103–1104 [it is inefficient to pursue a class action seeking only restitution when some class members would have to sue again for personal injuries].) Second, the class fails to exclude individuals with a "flat copayment" pharmaceutical benefit. Those individuals who would pay the same copayment for a generic drug (i.e., naproxen) as they would for a name brand drug (i.e., Vioxx) would have no economic loss under plaintiffs' theory of the case, and should therefore be excluded from the class. (*In re Cipro Cases I & II, supra,* 121 Cal.App.4th at p. 418.)

plaintiffs contend that the claims of TPP's are subsidiary to those of the individual plaintiffs. That is to say, if an individual patient, acting in reliance on Merck's misrepresentations, paid too much for Vioxx, the TPP which paid a portion of that purchase price should also be entitled to recover.

The flaw in plaintiffs' analysis is that it treats the TPP as a passive entity which simply pays its share of the cost of any prescription written for any of its members, with no independent say in the matter. While some TPP's may have, in fact, preapproved Vioxx for use in all patients, the evidence also indicates that other TPP's were not so passive.

P&T committees made their own decisions as to whether, and in what circumstances, Vioxx was indicated. Many conducted regular reviews of all published literature regarding the drugs in their formularies; some even conducted their own research studies.

With respect to plaintiffs' CLRA claim, we would consider whether the misrepresentations were material to the TPP's. Clearly, the evidence supports the trial court's conclusion that whether Merck's misrepresentations were material to individual patients is a completely different inquiry from whether the misrepresentations were material to P&T committees, whose sole purpose was to investigate which drugs were appropriate for their respective TPP's formularies. Similarly, with respect to the UCL claim, in considering whether the representation was likely to mislead, we consider the audience to whom the misrepresentation was directed. Whether an individual patient or physician was likely to be misled by Merck's representations is a completely different inquiry from whether a sophisticated P&T committee, with substantial resources and the ability to conduct its own research, was likely to be misled. Thus, the trial court did not err in concluding the individual plaintiffs' claims were not typical of the claims of the TPP's.

Additionally, we note that the evidence indicates that the claims of some TPP's would be completely at odds with plaintiffs' theory of the case. Plaintiffs pursue a theory that Vioxx was no more effective, and less safe, than naproxen or other traditional NSAID's. But the evidence indicated that there were some TPP's who would *only* pay for Vioxx if the patient had a history of gastrointestinal disease or had first tried two traditional NSAID's without success. While these TPP's may or may not have a claim against Merck, it clearly cannot be based on the theory which plaintiffs seek to pursue, because, for these TPP's, *every penny* they paid for Vioxx was paid for a patient for whom a traditional NSAID was *not* a viable medical option.

Thus, plaintiffs' claims are clearly not typical of these TPP's, whose payments were based on facts plaintiffs have virtually conceded are atypical.[17]

### 6. *Individual Issues Predominate—Reliance/Materiality—CLRA*

The trial court found that, as to the issue of reliance or materiality, the issue could not be resolved on a classwide basis and instead depended upon an individual determination with respect to each class member. Indeed, the trial court found that plaintiffs offered "no evidence indicating the inquiry can be conducted on a [classwide] basis," and that Merck had introduced "overwhelming evidence" that it could not be.

The trial court found that the decision to prescribe Vioxx is an individual decision made by a physician in reliance on many different factors, which vary from patient to patient. The trial court quoted from Dr. Silver's declaration, indicating eight individual factors which a physician must assess in determining whether and what to prescribe for pain. The trial court was also persuaded by Merck's anecdotal evidence that some patients "would rather assume the known risk of taking Vioxx in exchange for pain relief," thereby mandating an individual inquiry into patient desires. The trial court noted, "Plaintiffs adduce no evidence that will distinguish between class members to whom the cardiac risks posed by Vioxx were material and those to whom they were not." The trial court also specifically rejected plaintiffs' argument that classwide reliance could be presumed by the materiality of the misrepresentation, concluding that in the absence of "common evidence as to what consumers perceived or what they would find material," the inference did not apply.

On appeal, plaintiffs draw this court's attention to Merck's alleged common campaign of hiding the cardiovascular risks of Vioxx, arguing that such common misrepresentations support a common inference of reliance. Plaintiffs suggest that Merck hid "an increased risk of death," associated with Vioxx, and argue, "there can be nothing more material than an increased risk of death." Plaintiffs' argument is a vast oversimplification of the matter, and one which overlooks all of the evidence to the contrary on which the trial court relied.

First, evidence indicated that Vioxx *did not* present "an increased risk of death" compared to traditional NSAID's for *all* patients. Traditional NSAID's

---

[17] We again note that plaintiffs' complaint concedes that Vioxx "is a superior treatment in only a small percentage of patients who are at great risk from gastrointestinal side effects of NSAIDs." This concession would *defeat* the claims of any TPP's who paid for Vioxx only for patients who were at such risk, and, indeed, may also defeat the claims of any individual patient who obtained Vioxx through such a TPP.

killed 16,500 people per year due to gastrointestinal bleeds. For patients with stomach ulcers or other gastrointestinal risk factors, traditional NSAID's presented a higher risk of death than the risk of cardiovascular death posed by Vioxx. Second, evidence indicated that the cardiovascular risks of Vioxx *were not material* for all patients. Some patients would still take Vioxx today if it were on the market; some physicians would still prescribe it regardless of risks. Indeed, it cannot be disputed that other drugs pose similar, or even greater, risks of death than Vioxx, but are still in use—because, for some patients, the benefits outweigh the risks. Third, Merck introduced substantial evidence that all physicians are different and obtain their information about prescriptions from myriad sources. For those physicians with a distrust of statements made by the pharmaceutical industry, Merck's statements could not have been material. For those patients whose TPP's required preapproval of Vioxx (or would only pay for Vioxx under certain circumstances), the TPP's decision likely would override any patient or physician reliance on Merck's statements. Fourth, physicians consider many patient-specific factors in determining which drug to prescribe, including the patient's history and drug allergies, the condition being treated, and the potential for adverse reactions with the patient's other medications[18]—in addition to the risks and benefits associated with the drug. When all of these patient-specific factors are a part of the prescribing decision, the materiality of any statements made by Merck to any particular prescribing decision cannot be presumed. All of this evidence supports the trial court's conclusion that whether Merck's misrepresentations were material, and therefore induced reliance, is a matter on which individual issues prevailed over common issues, justifying denial of class certification with respect to the CLRA claim.[19]

---

[18] The possibility for *positive* results of combining drugs is also a factor. One of the named plaintiffs, Adam Selkowitz, was taking Coumadin during the time that he was on Vioxx. As Coumadin is an anticoagulant, Selkowitz's physician believed that it counteracted any cardiovascular clotting risks which may have been caused by Vioxx.

[19] The trial court stated that the individual nature of the materiality/reliance issue justified denial of class certification with respect to the UCL and FAL causes of action as well. Plaintiffs' argument that this constituted legal error is the main thrust of their appeal. We note that there is some case law which, without analysis or citation to authority, considers whether materiality/reliance is an individual or common issue with respect to a UCL action. (See, e.g., *Akkerman v. Mecta Corp., Inc., supra*, 152 Cal.App.4th at pp. 1097, 1103; *Caro v. Procter & Gamble Co., supra*, 18 Cal.App.4th at pp. 651–652, 667 & fn. 19.) Nonetheless, it is clear from Supreme Court authority that recovery in a UCL action is available in the absence of individual proof of deception, reliance, and injury. (*Tobacco II, supra*, 46 Cal.4th at p. 320.) Thus, we do not consider the trial court's findings with respect to materiality/reliance in the context of plaintiffs' UCL and FAL causes of action. The trial court's findings with respect to the measure of damages are sufficient to support its denial of class certification with respect to the UCL and FAL causes of action.

### 7. *Individual Issues Predominate—Injury/Restitution—UCL and FAL*[20]

As discussed above, remedies under the UCL are limited to injunctive relief and restitution. As an injunction is unavailable when there is no threat that the misconduct is likely to be repeated in the future, and Vioxx was withdrawn from the market in 2004, injunctive relief is not at issue in this case and we are concerned solely with restitution.

The trial court concluded that class injuries were "probably" subject to common proof. The court stated that it was "not satisfied that comparison to other NSAIDs is particularly appropriate or helpful." Nonetheless, the court stated that it could "imagine a scenario where a jury is permitted to place a value on the indignity an individual suffers when he or she is exposed to false advertising." The trial court relied on *Kwikset Corp. v. Superior Court* (2009) 171 Cal.App.4th 645 [90 Cal.Rptr.3d 123] for this proposition. The Supreme Court has granted review in that case (*Kwikset Corp. v. Superior Court*, review granted June 10, 2009, S171845), and plaintiffs do not argue in the instant appeal that they can recover indignity damages. Thus, although the trial court stated that class injuries were probably subject to common proof, the sole method by which plaintiffs claim that they were injured (the comparison to other NSAID's) was, in fact, rejected by the trial court. Similarly, the court specifically found that class *damages* are not subject to common proof. The court concluded that the monetary value plaintiffs wish to assign to their claim—the difference in price between Vioxx and a generic, nonspecific NSAID, implicates a patient-specific inquiry and therefore fails the community of interest test.[21] In short, the trial court rejected the entire premise of plaintiffs' class action. While the trial court allowed the possibility that plaintiffs could recover for having been exposed to misrepresentations, the trial court concluded that the *theory* that the entire class was harmed because Vioxx was no more effective, and less safe, than naproxen implicated individual issues of proof.

On appeal, plaintiffs mount a two-pronged challenge to the trial court's conclusions. First, they argue that they offered sufficient factual evidence that naproxen is a valid comparator to Vioxx. Specifically, they rely on the

---

[20] Our conclusions also apply to plaintiffs' common law cause of action for unjust enrichment. Without a common measure of restitution, this cause of action cannot be resolved on a classwide basis.

[21] The court stated that "[i]nability to commonly value each class member's loss does not weigh too heavily against finding that a community of interest exists, as the plaintiffs' bar has become adept at using matrices and statistical models to assess individual damages in a way that does not infringe on the due process rights of culpable defendants. But for what it is worth, the court finds the amount of money lost as a result of defendant's alleged wrongdoing is not subject to common proof." On appeal, plaintiffs do not offer any model for damages other than the comparison to naproxen, which the trial court rejected.

declaration of their medical expert to the effect that, based on the VIGOR study, Vioxx was, overall, no more effective, and less safe, than generic naproxen. The trial court did not err in rejecting naproxen as a valid *classwide* comparator. Defendants introduced substantial evidence that, after Vioxx was withdrawn from the market, *most* Vioxx patients switched to another COX-2 inhibitor,[22] not a generic NSAID such as naproxen. As this evidence indicates that Vioxx was worth more than naproxen to *a majority of class members*, it is more than sufficient to support the trial court's conclusion that naproxen is not a valid comparator on a classwide basis.

■ Plaintiffs' second argument is that the validity of naproxen as a comparator goes to the merits of the action, and should not be addressed on a motion for class certification. Plaintiffs argue that since the UCL and FAL allow an award of restitution without individualized proof of deception, reliance and injury, the trial court should not have been considering the validity of naproxen as a comparator. We do not disagree that a trial court has discretion to order restitution even in the absence of individualized proof of injury. (*Fletcher v. Security Pacific National Bank, supra,* 23 Cal.3d at p. 452.) However, in order to obtain classwide restitution under the UCL, plaintiffs need establish not only a misrepresentation that was likely to deceive (*Corbett v. Superior Court, supra,* 101 Cal.App.4th 649, 670) but also the existence of a "measurable amount" of restitution, supported by the evidence (*Colgan v. Leatherman Tool Group, Inc., supra,* 135 Cal.App.4th at p. 698). The failure of naproxen as a viable classwide comparator thus defeats the claim for classwide restitution. The trial court concluded that whether any particular plaintiff's loss can be measured by the difference in price between Vioxx and generic naproxen depends on issues specific to that individual plaintiff.[23] The evidence supports the trial court's conclusion in this regard.

■ Even if plaintiffs establish, classwide, that Merck misrepresented the cardiovascular risks of Vioxx in a manner that was likely to deceive plaintiffs and their prescribing physicians, no plaintiff would be able to recover without first identifying a proper comparator drug, the cost of which would provide the actual value to the patient of the Vioxx received. As the trial court concluded, on the evidence, that the issue of a proper comparator was a patient-specific issue, incorporating the patient's medical history, treatment needs, and drug interactions, the trial court properly concluded that restitution could not be calculated on a classwide basis.

---

[22] Using another COX-2 inhibitor as a comparator would likely defeat plaintiffs' action, as the COX-2 inhibitors were similarly priced. This is particularly true for any individual plaintiff on a prescription plan, whose copayment for a branded drug would be constant.

[23] Although the trial court also mentioned that there was no classwide evidence of the price paid for Vioxx, we agree with plaintiffs that the actual amounts paid could likely be resolved in a claims process. The trial court's "[o]verarching[]" concern was that there was no evidence that any particular NSAID would be a proper comparator for each class member.

## *DISPOSITION*

The judgment is affirmed. Merck shall recover its costs on appeal.

Klein, P. J., and Aldrich, J., concurred.

The petition of appellant Leoda Anderson for review by the Supreme Court was denied March 30, 2010, S179699. Chin, J., did not participate therein.