**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| NARGUESS NOOHI, individually, and on behalf of other members of the general public similarly situated, | No. 23-55190 |
| | D.C. No. 2:20-cv-03575-TJH-JEM |
| *Plaintiff-Appellee*, | |
| v. | |
| JOHNSON & JOHNSON CONSUMER INC., | OPINION |
| *Defendant-Appellant*. | |

Appeal from the United States District Court
for the Central District of California
Terry J. Hatter, Jr., District Judge, Presiding

Argued April 8, 2024
Submission Deferred April 10, 2024
Resubmitted July 18, 2025
Pasadena, California

Filed July 25, 2025

Before:  Marsha S. Berzon and Salvador Mendoza, Jr., Circuit Judges, and Susan R. Bolton,[*] District Judge.

Opinion by Judge Berzon

## SUMMARY[**]

### Class Certification

The panel affirmed the district court's order granting class certification in Narguess Noohi's putative class action against Johnson & Johnson Consumer Inc. ("JJCI"), alleging violations of California deceptive marketing and consumer protection laws.

Noohi purchased JJCI's Neutrogena Oil-Free Face Moisturizer for Sensitive Skin, which she alleged that, despite the name, contained oils and oil-based ingredients.  The district court certified a class of California purchasers of the product.

First, JJCI challenged the district court's reliance on the proposed damages model of Noohi's economic expert, Dr. Wade Roberts, who described his proposed process for measuring class members' damages by calculating the economic value to consumers of the "oil-free" statement.  The panel held that the district court did not

---

[*] The Honorable Susan R. Bolton, United States District Judge for the District of Arizona, sitting by designation.

[**] This summary constitutes no part of the opinion of the court.  It has been prepared by court staff for the convenience of the reader.

abuse its discretion in finding that Dr. Roberts' model could reliably measure damages on a classwide basis and adequately for present purposes matched Noohi's theory of harm.  However, JJCI must be given the opportunity to test the admissibility and reliability of Dr. Roberts' model once it has been fully executed.

Second, JJCI argued that the district court incorrectly determined that the elements of materiality and reliance were susceptible to common proof.  The panel held that materiality, and therefore an inference of reliance, can be established by reference to an objective, reasonable consumer standard, and so in this case may be proven in a way common to the class.  Although the inference of reliance is rebuttable, the district court did not abuse its discretion in determining that JJCI failed to rebut that inference.

Accordingly, the panel affirmed the district court's grant of class certification.

## COUNSEL

Adrian Bacon (argued), Meghan E. George, and Todd M. Friedman, Law Offices of Todd M. Friedman, Woodland Hills, California, for Plaintiff-Appellee.

Hannah Y.S. Chanoine (argued), O'Melveny & Myers LLP, New York, New York; Matthew D. Powers and Rebecca Shore, O'Melveny & Myers LLP, San Francisco, California; Martha F. Hutton, O'Melveny & Myers LLP, Washington, D.C.; Jason Zarrow, O'Melveny & Myers LLP, Los Angeles, California; for Defendant-Appellant.

## OPINION

BERZON, Circuit Judge:

Johnson & Johnson Consumer Inc. ("JJCI") markets and sells a cosmetic product named "Neutrogena Oil-Free Face Moisturizer for Sensitive Skin" ("the Product").[1] In search of an oil-free skin moisturizer, Narguess Noohi purchased the Product. Noohi alleges that, despite the name, Neutrogena Oil-Free Face Moisturizer for Sensitive Skin contains oils and oil-based ingredients. After discovering that alleged deception, Noohi brought this putative consumer class action against JJCI, alleging violations of California deceptive marketing and consumer protection laws. The district court certified a class of California purchasers of the Product. JJCI now appeals that grant of class certification on two grounds.

First, JJCI challenges the district court's reliance on the proposed damages model of Noohi's economic expert. JJCI maintains that the district court held Noohi to only a "prima facie" standard with regard to the damages model and unduly rejected its evidentiary challenges to the expert's testimony. The result, JJCI contends, was that the approved model was too underdeveloped and preliminary to support the district court's finding that common questions

---

[1] The parties refer to the Product as "Neutrogena Oil-Free Face Moisturizer for Sensitive Skin." That wording does not appear on the front of the bottle or the box it comes in. The back of the box includes the label "Neutrogena® Oil-Free Moisture for Sensitive Skin." The largest, most prominently placed text on the front of the box and bottle reads simply "oil-free moisture." "Sensitive skin" appears in smaller text below, and "ultra-gentle facial moisturizer" appears in even smaller text below that.

predominated as to injury. JJCI further contends that the model does not match Noohi's theory of harm. We reject JJCI's challenges to the damages model. In doing so, we rely on this Court's recent holding that "class action plaintiffs may rely on a reliable though not-yet-executed damages model to demonstrate that damages are susceptible to common proof so long as the district court finds that the model is reliable and, if applied to the proposed class, will be able to calculate damages in a manner common to the class at trial." *Lytle v. Nutramax Lab'ys, Inc.*, 114 F.4th 1011, 1019 (9th Cir. 2024). We also conclude that the district court did not abuse its discretion in finding the proposed damages model fit Noohi's theory of harm and was sufficient for purposes of class certification.

Second, JJCI argues that the district court incorrectly determined that the elements of materiality and reliance were susceptible to common proof. We disagree. Materiality, and therefore an inference of reliance, can be established by reference to an objective, reasonable consumer standard, and so in this case may be proven in a way common to the class. Although the inference of reliance is rebuttable, the district court did not abuse its discretion in determining that JJCI failed to rebut that inference.

For these reasons, discussed more fully below, we affirm the district court's grant of class certification.

## I.  BACKGROUND

JJCI develops, markets, and sells Neutrogena Oil-Free Face Moisturizer for Sensitive Skin. Plaintiff-Appellee Narguess Noohi purchased this Product because she wanted an oil-free moisturizer for her skin. Noohi alleges that, despite the title "oil-free," the Product contains two ingredients—ethylhexyl palmitate and soybean sterols—that

are oils or oil-based compounds.  Noohi further alleges that she would not have purchased the Product had she known it contained oils.

In her operative complaint, Noohi asserted four claims against JJCI: (1) violation of California's False Advertising Law ("FAL"), Cal. Bus. & Prof. Code §§ 17500 *et seq.*; (2) violation of California's Unfair Competition Law ("UCL"), *id.* §§ 17200 *et seq.*; (3) violation of California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750 *et seq.*; and (4) common law fraud.  Noohi moved to certify a class under Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) as to her three statutory claims.

In support of her motion for class certification, Noohi submitted declarations and reports from two experts—Dr. Michael Hickner, a professor of materials science and engineering, and Dr. Wade Roberts, an econometrics expert. In a declaration, Dr. Hickner explained the meaning and properties of "oil."   Dr. Hickner opined that, although "oil" lacks a standard scientific definition, the term generally refers to a "naturally-derived, chemically synthesized, or petrochemically-refined slippery . . . substance" that is hydrophobic—meaning that it does not mix with water—and more viscous than water, but less dense.  Dr. Hickner stated that, based on their chemical structures and physical properties, ethylhexyl palmitate and soybean sterols are oils with oil-like physical properties.

In an expert report, Dr. Roberts described his proposed process for measuring class members' damages by calculating the economic value to consumers of the "oil-free" statement.  Dr. Roberts described a two-step process. First, Dr. Roberts would conduct qualitative market research designed to uncover consumers' understanding of and

response to the "oil-free" label.  Second, Dr. Roberts would conduct quantitative surveying and market analysis to measure the economic value to consumers of the "oil-free" statement.  At the time of class certification, discovery was still ongoing, and Dr. Roberts had not yet fully developed or executed his proposed damages model.

In opposition to class certification, JJCI submitted declarations from its own experts contesting Dr. Hickner's classification of the ingredients as oils and raised evidentiary objections based on Dr. Hickner's qualifications and methodology.  JJCI also submitted declarations from its own economic experts contesting the design of Dr. Roberts' damages model and raised evidentiary objections based on Dr. Roberts' qualifications and proposed methodology.

After considering JJCI's experts' opinions and its evidentiary objections, the district court found both Dr. Hickner and Dr. Roberts qualified and their opinions sufficiently reliable to be considered for class certification purposes.[2]   The district court rejected JJCI's evidentiary objections to Noohi's experts' qualifications and their opinions.   The district court further found that Noohi satisfied the threshold class certification requirements of Federal Rule of Civil Procedure 23(a) and the specific requirements of both Federal Rule of Civil Procedure

---

[2] The district court found that Dr. Hickner's declaration was inadmissible in its current form under *Daubert v. Merrell Down Pharms., Inc.*, 509 U.S. 579 (1993), as Dr. Hickner had failed to demonstrate that his conclusions were based on past research, peer reviewed, or otherwise supported by established scientific methods.   The district court nevertheless found Dr. Hickner's opinion sufficient for purposes of class certification because it was likely that his opinion could be presented in an admissible form at trial and would be useful to the trier of fact in determining whether the Product was deceptive.

23(b)(2) and 23(b)(3). The district court therefore granted Noohi's motion for class certification, certifying a class defined as "all consumers who purchased Neutrogena Oil-Free Moisture Sensitive Skin in California between April 17, 2016 and November 30, 2022," the date of class certification.

JJCI timely sought and obtained permission to file this interlocutory appeal of the district court's class certification order, pursuant to Federal Rule of Civil Procedure 23(f).

## II. DISCUSSION

Before it can certify a class, a district court must conduct a "rigorous analysis" to ensure that the requirements of Federal Rule of Civil Procedure 23 are satisfied. *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F. 4th 651, 664 (9th Cir. 2022) (en banc) (quoting *Gen. Tel. Co. of the Sw. v. Falcon*, 457 U.S. 147, 161 (1982)). "[P]laintiffs wishing to proceed through a class action must actually *prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Halliburton Co. v. Erica P. John Fund, Inc.*, 573 U.S. 258, 275 (2014).

The crux of the dispute here is whether Federal Rule of Civil Procedure 23(b)(3)'s requirement that "questions of law or fact common to class members predominate over any questions affecting only individual members" has been adequately met. Rule 23(b)(3)'s predominance requirement "presupposes satisfaction of the commonality requirement of [Rule] 23(a)(2), which itself tests 'the capacity of a classwide proceeding to generate common *answers* apt to

drive the resolution of the litigation.'"[3]  *Lytle*, 114 F.4th at 1023 (quoting *Alcantar v. Hobart Serv.*, 800 F.3d 1047, 1052 (9th Cir. 2015)).  "But the predominance inquiry goes further and 'asks whether the common, aggregation-enabling, issues in the case are more prevalent or important than the non-common, aggregation-defeating, individual issues.'"  *Id.* (quoting *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 453 (2016)).

Importantly, the inquiry at the class certification stage differs from that at summary judgment.  "A court, when asked to certify a class, is merely to decide a suitable method of adjudicating the case and should not 'turn class certification into a mini-trial' on the merits."  *Edwards v. First Am. Corp.*, 798 F.3d 1172, 1178 (9th Cir. 2015) (quoting *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 983 n.8 (9th Cir. 2011)).  "In determining whether the 'common question' prerequisite is met, a district court is limited to resolving whether the evidence establishes that a common question is *capable* of class-wide resolution, not whether the evidence in fact establishes that plaintiffs would win at trial."  *Olean*, 31 F.4th at 666–67.   "With respect to the predominance inquiry specifically, a district court must evaluate 'the method or methods by which plaintiffs propose

---

[3] Federal Rule of Civil Procedure 23(b)(3) provides:

> A class action may be maintained if Rule 23(a) is satisfied and if . . . the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.

Fed. R. Civ. P. 23(b)(3).

to use the class-wide evidence to prove the common question in one stroke.'" *Lytle*, 114 F.4th at 1023 (alteration omitted) (quoting *Olean*, 31 F.4th at 666).

"We review the decision to certify a class and 'any particular underlying Rule 23 determination involving a discretionary determination' for an abuse of discretion." *Olean*, 31 F.4th at 663 (quoting *Yokoyama v. Midland Nat'l Life Ins. Co.*, 594 F.3d 1087, 1091 (9th Cir. 2010)). We review de novo "the district court's determination of underlying legal questions" and review for clear error "its determination of underlying factual questions." *Id.* "A district court applying the correct legal standard abuses its discretion only if 'it (1) relies on an improper factor, (2) omits a substantial factor, or (3) commits a clear error of judgment in weighing the correct mix of factors.'" *Sali v. Corona Reg'l Med. Ctr.*, 909 F.3d 996, 1002 (9th Cir. 2018) (quoting *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 956 (9th Cir. 2013)). "We review evidentiary rulings for an abuse of discretion." *Lytle*, 114 F.4th at 1023–24.

## A.

JJCI's first argument on appeal is that Dr. Roberts' proposed damages model was too underdeveloped at the time of class certification to be admissible or reliable under *Daubert* and Federal Rule of Evidence 702. JJCI further maintains that the district court, in rejecting its evidentiary challenges to the damages model and finding that the model demonstrated that damages were capable of measurement on a classwide basis, failed to engage in the "rigorous analysis" required under Rule 23. We disagree.

This Court's recent decision in *Lytle*, in which the defendants raised objections similar to those put forward by JJCI, describes the appropriate inquiry into a damages model

at class certification. As an initial matter, *Lytle* holds that "there is no categorical prohibition on a district court relying on an unexecuted damages model to certify a class." 114 F.4th at 1029. *Lytle* further makes clear "there is no requirement that the evidence relied upon by Plaintiffs to support class certification be presented in an admissible form at the class certification stage." *Id.* at 1024–25. Instead, "an inquiry into the evidence's ultimate admissibility should go to the weight that evidence is given at the class certification stage." *Id.* at 1025 (quoting *Sali*, 909 F.3d at 1006). But "'[n]either the possibility that a plaintiff will be unable to prove his allegations, nor the possibility that the later course of the suit might unforeseeably prove the original decision to certify the class wrong, is a basis for declining to certify a class which apparently satisfies' Rule 23." *Id.* (alteration in original) (quoting *Sali*, 909 F.3d at 1004–05).

Additionally, evaluation of an unexecuted damages model at class certification "requires determining whether the expert's methodology is reliable, so that a limited *Daubert* analysis may be necessary, but the more full-blown *Daubert* assessment of the results of the application of the model would be premature." *Id.* at 1031. Instead, "the court considers only if expert evidence is useful in evaluating whether class certification requirements have been met." *Id*. As *Lytle* emphasizes, in applying this standard to an unexecuted damages model, "the ultimate inquiry is whether a proposed model is likely to provide common answers at trial." *Id.* at 1032 n.8.

Here, as in *Lytle*, the district court's application of *Daubert* at the class certification stage was not an abuse of

discretion.[4]   The district court correctly recognized that the Plaintiffs were required to "show that damages are capable of measurement on a class-wide basis."   The court then considered and explained how Dr. Roberts proposed to do so, while noting that Noohi "need not show the actual amount of damages incurred" at the time of class certification.   In determining that Dr. Roberts' model was reliable and capable of measuring damages on a classwide basis, the district court found Dr. Roberts qualified as an expert in econometrics and relied on the fact that other courts have approved similar damages models in other CLRA cases.

JJCI contends that Dr. Roberts' survey question design and selection of the final survey population was incomplete and preliminary, and when further developed and executed, may bias the results of his model.   The contention that Dr. Roberts' model was not sufficiently developed to support the district court's approval of class certification is unpersuasive.   To be sure, "[m]erely gesturing at a model or

---

[4] Noohi argues that JJCI did not challenge Dr. Roberts' expert testimony under *Daubert* before the district court and so may not raise a *Daubert* challenge now.   We do not agree.   In the district court, JJCI filed "Defendant [JJCI's] Evidentiary Objections to Plaintiff's Experts Dr. Hickner and Dr. Roberts in Support of Opposition to Class Certification," in which it argued that Dr. Roberts' analysis did not "survive[] scrutiny under *Daubert*" and "should be excluded."   JJCI did not request a *Daubert* hearing and none was held.   But the district court did consider JJCI's evidentiary objections under the *Daubert* standard to the extent appropriate at class certification, noting that JJCI's critiques did not establish that Dr. Roberts' model was "inadequate."   *See Lytle*, 114 F.4th 1024–25, 1031.   As the district court's consideration of JJCI's evidentiary objections constituted a discretionary determination, we review that determination for an abuse of discretion.   *See Olean*, 31 F.4th at 663.

describing a general method will not suffice . . . . Rather, plaintiffs—or their expert—must chart out a path to obtain all necessary data and demonstrate that the proposed method will be viable as applied to the facts of a given case." *Lytle*, 114 F.4th at 1032.

Dr. Roberts did so here. Dr. Roberts is qualified as an expert in econometrics with experience in survey design and execution. His expert report explains how, through a combination of qualitative and quantitative surveying, he will measure classwide damages. Like the expert in *Lytle*, *see* 114 F.4th at 1032, Dr. Roberts had not yet finally worded the questions or executed the survey, but he had designed the survey methodology and identified target respondent populations.

*Lytle* held that there was no abuse of discretion where the district court relied on an expert who presented a model but "had not yet collected" data, over the defendant's objection that "the precise wording of a questionnaire is critical." *Id.* at 1032–33. Similarly, the district court in this case did not abuse its discretion in finding that JJCI's challenges to Dr. Roberts' opinion evidence were "not ripe" at the class certification stage. As the *Lytle* panel explained, "[t]he speculative possibility that [Dr. Roberts] might slip up in executing his model, standing alone, is insufficient to defeat class certification." *Id*. at 1033.

JJCI further argues that Dr. Roberts' proposed damages model is not consistent with Noohi's theory of harm, thus contravening *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). We are not persuaded.

*Comcast* requires that plaintiffs "be able to show that their damages stemmed from the defendant's actions that created the legal liability." *Levya v. Medline Indus. Inc.*, 716

F.3d 510, 514 (9th Cir. 2013) (citing *Comcast*, 569 U.S. at 38). Noohi alleges that JJCI misled consumers, in violation of the CLRA, UCL, and FAL, by labeling the Product "oil-free." Noohi's theory of harm is that class members paid more for the Product than they would have absent the misleading title "oil-free." Under that theory of harm, the amount of overpayment attributable to the challenged term—the "price premium"—is the standard measure of damages under the CLRA and of restitution under the FAL and UCL.[5] *See, e.g.*, *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 988–89 (9th Cir. 2015); *Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 817–818 (9th Cir. 2019); *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, 130–31 (2009).

Dr. Roberts proposed to measure that overpayment. The quantitative portion of Dr. Roberts' analysis would involve a "Van Westendorp price elasticity test." As Dr. Roberts described in his expert report, survey participants—a representative sample of consumers whose selection will be informed in part by the qualitative survey and JJCI's internal data—will be shown the Product and asked at what prices they would find the Product "too inexpensive to be considered, a good value, expensive but still worth considering, and finally, too expensive to be considered." Next, Dr. Roberts will introduce information "challenging the 'oil-free' claim." For example, Dr. Roberts proposed informing the survey participants that some of the Product's ingredients contained extracts of soybean and palm oil.

---

[5] Plaintiffs may seek damages under the CLRA. Under the FAL and UCL, plaintiffs are limited to equitable relief, including restitution. *See Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 695 (2006).

After sharing that information, Dr. Roberts will again ask the survey participants the same pricing questions.

Using the difference between participants' two "good value" prices—before and after the "exposure" to information challenging the "oil-free" label—Dr. Roberts will use regression analysis to determine the percent of the product's overall price associated with the phrase "oil-free." That coefficient will then be multiplied by the Product's actual market price from the class period to calculate the class members' "damages (financial losses) directly measurable from changes in the perceived value of the product." As the district court found, courts have approved of similar "benefit-of-the-bargain" damages models in deceptive marketing cases under California law. *See Nguyen*, 932 F.3d at 818 (collecting cases).

Dr. Roberts also proposed to measure "softer" kinds of harms consumers might experience, such as changes to "overall consumer satisfaction, brand loyalty, willingness to recommend [the Product], and repurchase intent." To measure these less "concrete" damages, Dr. Roberts proposed to ask the survey participants questions about their attitudes towards and impressions of the Product before and after the "exposure." Dr. Roberts will then use "multivariate statistic[al]" analysis to quantify the changes in respondents' perceptions of the Product.

Dr. Roberts' proposal to quantify "soft" damages will include damages beyond those reflecting Noohi's theory of overpayment. According to Dr. Roberts' own description of his methodology, the damages associated with changes in a decline in consumers' satisfaction, brand loyalty, willingness to recommend the product, and repurchase intent would be calculated in addition to the price premium

measured via the Van Westendorp pricing exercise. Including an economic value associated with those attributes in the ultimate damages calculation would inflate damages beyond the price premium. But that fact alone does not mean that Dr. Roberts' model violates *Comcast*.

The concern in *Comcast* was not only that the damages model there proposed to measure damages not associated with the plaintiffs' theory of harm, but also that the model was incapable of separating out those damages from damages tied to the plaintiff's theory. 569 U.S. at 36–37. That problem—key to the Court's holding in *Comcast*—is not present here. The price premium measurement will be informed by different survey questions than those associated with the "softer" damages and will be calculated separately from those harms. No extra work is needed to, in the words of *Comcast*, "bridge the difference[]" between the cognizable and non-cognizable damage measurements. *Id.* at 38. Dr. Roberts need only calculate the price premium without including his separate measurement of the "softer" damages to produce a measure of damages consistent with the theory of the class claims.

JJCI further takes issue with Dr. Roberts' particular proposed methodology for measuring the price premium. Rather than comparing what consumers are willing to pay before and after they learn that the Product is not "oil-fee," JJCI argues, Dr. Roberts should compare "what consumers paid for 'Neutrogena's Oil-Free Face Moisturizer for Sensitive Skin' and what they would have been willing to pay for 'Neutrogena's Face Moisturizer for Sensitive Skin,' holding everything else about the product's performance and packaging (other than the 'oil-free' claim) constant." Otherwise, JJCI maintains, Dr. Roberts' model will improperly include the "emotional value" that consumers

associate with learning that the "Product's label contains a lie."

JJCI's contention relies on an improper understanding of the measure of the price premium under California consumer protection law.   California law does not prescribe any specific means of measuring a price premium for purposes of actual damages or restitution.   In fact, "[c]lass wide damages calculations under the UCL, FAL, and CLRA are particularly forgiving." *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1183 (9th Cir. 2017), *rev'd on other grounds*, 586 U.S. 188 (2019).   "California law 'requires only that some reasonable basis of computation of damages be used, and the damages may be computed even if the result reached is an approximation.'" *Id.* (quoting *Pulaski*, 802 F.3d at 989).

There is no talismanic means of measuring damages for deceptive marketing claims under California consumer protection law.  For example, courts have approved damages models that use conjoint analysis, which asks survey respondents to select from a range of similar products that vary in characteristics like price, labeling, and design. *See Lytle*, 114 F.4th at 1033 (collecting cases).  Courts have also deemed "contingent valuation analysis" a "reliable survey based methodology to determine price premium damages." *Hilsley v. Ocean Spray Cranberries, Inc.*, No. 17-CV-2335, 2019 WL 3006465, *3 (S.D. Cal. July 10, 2019) (collecting cases).   That approach, similar to Dr. Roberts' proposed methodology, varies the features of a single product by presenting new information about the product and asks survey participants to "directly report what they are willing to pay for it." *Id.*

To be sure, a poorly conducted survey might produce responses that inflate damages.  For instance, poorly worded

survey questions might induce bias in respondents, *see Lytle*, 114 F.4th at 1033, or survey conditions might not accurately replicate the conditions faced by consumers in stores, *see Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1107–08 (N.D. Cal. 2018). But Dr. Roberts recognized those risks. In his deposition, Dr. Roberts stated that leading or otherwise poorly framed prompts—for example, telling survey participants "you were lied to"—could lead to skewed responses. Dr. Roberts also emphasized the need to conduct the pricing survey in a "neutral" manner. Should Dr. Roberts' execution of the survey fall short of that mark, JJCI may explore that failure at summary judgment, in a renewed *Daubert* motion, or during cross-examination at trial. *See, e.g.*, *Lytle*, 114 F.4th at 1033–34; *Hadley*, 324 F. Supp. 3d at 1108. At the class certification stage, the key inquiry under *Comcast* is simply whether Noohi has "demonstrated the nexus between [her] legal theory . . . and [her] damages model." *Nguyen*, 932 F.3d at 821. As explained, Dr. Roberts' proposed damages model was designed to measure a price premium associated with the misleading label at the heart of Noohi's claims. Whether the proposed calculation of the price premium will prove accurate is a "merits inquir[y] unrelated to class certification." *Id.*

In sum, the district court did not abuse its discretion in finding that Dr. Roberts' model could reliably measure damages on a classwide basis and adequately for present purposes matched Noohi's theory of harm. That said, we reiterate *Lytle*'s warning that a "plaintiff may not avoid ultimate scrutiny of the admissibility of their experts' final opinions simply by declining to develop those opinions in advance of class certification." 114 F.4th at 1034. Accordingly, JJCI must be given the opportunity to test the

admissibility and reliability of Dr. Roberts' model once it has been fully executed.

## B.

JJCI's second argument on appeal is that the district court abused its discretion in finding that common issues predominate with respect to the elements of materiality and reliance.  Because materiality and reliance are substantive components of Noohi's claims, answering whether they present common issues necessarily requires some overlap with the merits.  We consider such merits questions "to the extent—but only to the extent—that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 466 (2013).

The UCL prohibits any "unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."  Cal. Bus. & Prof. Code § 17200.  The FAL prohibits "untrue or misleading" statements in the course of business.  *Id.* § 17500.  The UCL and FAL are "'broad' and 'sweeping' to 'protect both consumers and competitors by promoting fair competition in commercial markets for goods and services.'" *Pulaski*, 802 F.3d at 985 (quoting *Kwikset Corp. v. Superior Ct.*, 51 Cal. 4th 310, 320 (2011)).  Accordingly, to state a claim under the UCL or the FAL "based on false advertising or promotional practices, it is necessary only to show that members of the public are likely to be deceived." *Id.* (quoting *In re Tobacco II Cases*, 46 Cal. 4th 298, 312 (2009)).  Whether a statement is likely to deceive members of the public is decided by reference to an objective "reasonable consumer" standard. *Ebner v. Fresh, Inc.*, 838 F.3d 958, 965 (9th Cir. 2016).

The CLRA prohibits "unfair methods of competition and unfair or deceptive acts or practices." Cal. Civ. Code § 770. To state a claim under the CLRA, "a plaintiff must show (1) the defendant engaged in deceptive conduct and (2) the deception caused [the] plaintiff harm." *Lytle*, 114 F.4th at 1034. "[U]nder the CLRA, '[c]ausation, on a classwide basis, may be established by *materiality*. If the trial court finds that material misrepresentations have been made to the entire class, an inference of reliance arises as to the class.'" *Id.* (second alteration in original) (quoting *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1022 (9th Cir. 2011)). Materiality under the CLRA is determined using a reasonable consumer standard: a misrepresentation is material "if a reasonable [consumer] would attach importance to its existence or nonexistence in determining his choice of action in the transaction in question." *Stearns*, 655 F.3d at 1022 (quoting *Steroid Hormone Prod. Cases*, 181 Cal. App. 4th 145, 157 (2010)).

"Because materiality (and, hence, in this case reliance) may be proved by reference to an objective, reasonable consumer standard, reliance under the CLRA is generally susceptible to common proof." *Lytle*, 114 F.4th at 1034. The same is true as to whether a statement is likely to deceive "members of *the public*" under the FAL and UCL. *Pulaski*, 902 F.3d at 985 (emphasis added) (quoting *In re Tobacco II Cases*, 46 Cal. 4th at 312). Accordingly, deceptive marketing claims under these California consumer protection statutes are generally "ideal for class certification." *Id.* (quoting *Bradach v. Pharmavite, LLC*, 735 F. App'x 251, 255 (9th Cir. 2018)).

There is an important caveat to this reasoning: "while materiality can support an inference of reliance, that does not necessarily mean that the inference will hold as to the entire

class, such that common questions predominate." *Lytle*, 114 F.4th at 1034–35. "If the misrepresentation or omission is not material as to all class members, the issue of reliance 'would vary from consumer to consumer' and the class should not be certified." *Stearns*, 655 F.3d at 1022–23 (quoting *In re Vioxx Class Cases*, 180 Cal. App. 4th at 129).

JJCI contends that the district court ignored the caveat to the inference of reliance and found materiality and reliance to be "automatically common questions in false-advertising cases under California law." The district court here did not explicitly mention and apply the caveat to the inference of reliance. Nevertheless, our review of the district court's decision and the record at class certification confirms that the district court did not abuse its discretion in finding that the materiality and reliance elements of Noohi's claims could be resolved on a classwide basis and that common issues therefore predominate.

In granting class certification, the district court relied on the fact that materiality, and therefore reliance, can be shown by reference to a reasonable consumer standard, avoiding the need for individualized inquiries. The district court also relied on the undisputed evidence of classwide exposure to the "oil-free" language, specifically the fact that the "oil-free" term appears in the Product's name prominently displayed on the front of the packaging. In determining whether a statement is materially misleading under California law, "the primary evidence . . . is the advertising itself." *Colgan v. Leatherman Tool Grp., Inc.*, 135 Cal. App. 4th 663, 679 (2006) (citation omitted). It is hard to imagine that consumers would purchase a product labeled "Oil-Free Moisture" without regard to whether the product was free from oil. If, somehow, the evidence later shows that a reasonable consumer would not have found the product's

name to be material to their purchase decision, "the failure of proof on the element of materiality would end the case for one and for all; no claim would remain in which individual reliance issues could potentially predominate." *Amgen*, 568 U.S. at 468.

Given the objective standard for materiality and the undisputed evidence of classwide exposure, Noohi is entitled to the inference that reliance can be shown via common proof. *See In re Vioxx Class Cases*, 180 Cal. App. 4th at 129.

JJCI's arguments for why it has rebutted that inference are not persuasive. JJCI first maintains that materiality is not subject to common proof here because the understanding of the phrase "oil-free" may differ across the class. In JJCI's telling, consumers might interpret "oil-free" as meaning that the Product does not contain oils, does not contain ingredients derived from oils, or does not perform in a way consumers consider "oily." Because the materiality of the phrase "oil-free" depends on what meaning consumers attach to it, JJCI argues materiality cannot be determined on a classwide basis. This argument fails for two reasons.

First, JJCI did not offer persuasive evidence to the district court that the meaning of "oil-free" in fact varies across the class. Instead, relying on Noohi's testimony as to her motivations for purchasing the Product and the expert report of a dermatologist as to the dermatologic uses of oil-free products, JJCI contends—without any empirical evidence—that "'oil-free' *can* be interpreted in multiple ways by consumers" and that consumers generally "understand and seek out 'oil-free' products for a multitude of reasons." Beyond that *ipse dixit* argument, JJCI presents

no evidence that materiality or reliance actually varies across the class.

Second, even if JJCI had presented evidence that the understanding of the phrase "oil-free" varies across the class, JJCI has not demonstrated why that fact would undermine the commonality of materiality based on a reasonable consumer standard, or rebut the inference of reliance. In *Lytle*, this Court discussed *Stearns*, 655 F.3d 1017, *In re Vioxx Class Cases*, 180 Cal. App. 4th 116, and *Fairbanks v. Farmers New World Life Insurance Co.*, 197 Cal. App. 4th 544 (2011), three cases in which courts found materiality differed across a class and so defeated the inference of reliance and class certification. *See Lytle*, 114 F.4th at 1037–38. JJCI relies on all three cases here. *Lytle* determined that the "common theme unifying each of these cases is that a sizable portion of the class either were not misled by the statements or would not have found the misrepresentations to be material had they known the truth." *Id.* at 1038.

For example, in *Fairbanks*, the plaintiffs alleged that the defendant's marketing of life insurance policies was misleading because the defendant marketed the policies as "permanent" when in fact the policies were not permanent and were "systematically underfunded." 197 Cal. App. 4th at 553. The court found that the materiality of the "permanent" policy claim was not subject to common proof because "many, if not most" policy purchasers did not intend for the policy to be permanent or had no expectation one way or the other. *Id.* at 907. For those purchasers, the fact that the policy was marketed as permanent was immaterial to their decision to buy it. *Id.*

In *In re Vioxx Class Cases*, the plaintiffs alleged Merck "hid 'an increased risk of death,' associated with [the anti-

inflammatory drug] Vioxx." 180 Cal. App. 4th at 133. The court found class treatment inappropriate because of "overwhelming evidence" that Vioxx did not increase the risk of death for all patients, and that some patients would "still take Vioxx today" if it was prescribed and they were told of the risks. 180 Cal. App. 4th at 103, 133–34. The key to the courts' decisions in *Fairbanks* and *Vioxx* was that the class at issue was shown to include a substantial number of individuals for whom the allegedly deceptive statements would not have affected their purchase decision and so were not material.

JJCI's contention, in contrast, is not that the "oil-free" title did not affect the purchase decision of—and so was immaterial to—a portion of the class, but that it affected the purchase decision of class members—and so was material— for different reasons. That is, JJCI does not suggest, let alone point to evidence demonstrating that, a consumer who thought "oil-free" meant "without oils" was any more or less likely to be affected in their purchase decision than someone who thought it meant "without oil derivatives" or not tactilely "oily."

So understood, JJCI's argument, even if true, does not raise the same concerns regarding the susceptibility of materiality to common proof as does a showing that a contested statement was not material at all to some class members. The baseline inquiry is whether the statement was material to a reasonable person. An affirmative answer to that question gives rise to an inference of reliance. A showing that for some portion of a class that statement was not in fact material upsets that inference. But a showing that a statement was material to different class members in different ways does not.

Courts addressing CLRA, UCL, and FAL claims have consistently held that a plaintiff need not establish at the class certification stage that class members share a uniform understanding of the contested term. *See, e.g.*, *Lytle v. Nutramax Lab'ys, Inc.*, No. ED CV 19-0835, 2022 WL 1600047, at \*15 (C.D. Cal. May 6, 2022); *Bailey v. Rite Aid Corp.*, 338 F.R.D. 390, 402 n.12 (N.D. Cal. 2021); *Fitzhenry-Russell v. Dr. Pepper Snapple Grp., Inc.*, 326 F.R.D. 592, 613 (N.D. Cal. 2018); *Elkies v. Johnson & Johnson Servs., Inc.*, No. CV 17-7320, 2018 WL 11223465, at \*4 (C.D. Cal. Oct. 18, 2018).[6]  For example, the district court in *Lytle* (which we affirmed) rejected the argument that the plaintiff there had to show the class shared a common understanding of the term "Joint Health Supplement" at the class certification stage.  *Lytle*, 2022 WL 1600047, at \*15. Similarly, the district court in *Bailey* found "no controlling authority" to support the contention that class members had to share a common definition of the term "rapid release." *Bailey*, 338 F.R.D. at 402 n.12.

---

[6] JJCI cites *In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, No. ML 13-2438, 2017 WL 2559615, at \*8–9 (C.D. Cal. June 7, 2017), in support of its argument that the lack of a common definition for an allegedly deceptive term undermines predominance as to materiality.  *In re 5-Hour Energy* is neither controlling nor persuasive.  The plaintiffs in *In re 5-Hour Energy* alleged that the term at issue there, "energy," was material based on a narrow definition of the term as "caloric energy."  *In re 5-Hour Energy*, 2017 WL 2559615, at \*9.  The district court determined that evidence showed that a reasonable consumer would not share the plaintiffs' particular understanding of the inherently ambiguous term— the only understanding under which the plaintiffs argued the term was material.  *Id.*  JJCI has not suggested that a portion of the class here—or a hypothetical reasonable consumer—would understand "oil-free" in a way that would make that phrase immaterial to their purchase decision.

In sum, the district court's decision that materiality, and so the inference of reliance therefrom, are subject to common proof even if the class understood "oil-fee" in slightly different ways was not an abuse of discretion.

JJCI further contends that it rebutted the inference of reliance by pointing to its positive customer reviews and internal purchasing data demonstrating that 30% of the Products' purchasers were repeat buyers. The existence of repeat purchasers does not defeat the inference of reliance. There is no indication that the repeat purchasers knew that the Product was not oil-free and purchased it anyway. *Cf. In re Vioxx Class Cases*, 180 Cal. App. 4th at 133–34. The existence of positive reviews or other product attributes that purchasers found desirable is similarly insufficient to defeat materiality or the inference of reliance. To establish reliance under the CLRA, UCL, and FAL, a misrepresentation need not be "the *sole* or even the *decisive* cause of the injury-producing conduct." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1020 (9th Cir. 2020) (quoting *Kwikset*, 51 Cal. 4th at 327).

For all these reasons, the district court did not abuse its discretion in finding that common issues predominate with respect to materiality and reliance.[7]

---

[7] JJCI argues that should we find materiality susceptible to common proof, we must decide whether *Stearns'* holding that UCL plaintiffs need not show reliance as to absent class members is good law in light of the Supreme Court's holding in *TransUnion LLC v. Ramirez*, 594 U.S. 413 (2021), that all class members must have standing to recover damages. We need not decide that point here. Our holding is that Noohi has demonstrated that reliance is susceptible to common proof as to the entire class. We do not rely on the contested portion of *Stearns* to conclude that class certification was appropriate.

## CONCLUSION

For the foregoing reasons, we affirm the district court's grant of class certification.

**AFFIRMED.**